# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00805-CV

---

**B. A., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

### FROM THE 126TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-22-008572, THE HONORABLE CATHERINE MAUZY, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellant B.A. (Mother) appeals from the district court's order, following a bench trial, terminating her parental rights to her son, J.L. (John), who was approximately one year old at the time of trial.[1] Mother's court-appointed counsel has filed an *Anders* brief concluding that the appeal is frivolous and without merit. *See Anders v. California*, 386 U.S. 738, 744 (1967); *In re P.M.*, 520 S.W.3d 24, 27 & n.10 (Tex. 2016) (per curiam) (approving use of *Anders* procedure in appeals from termination of parental rights). The brief meets the requirements of *Anders* by presenting a professional evaluation of the record and demonstrating why there are no arguable grounds to be advanced on appeal. *See* 386 U.S. at 744; *Taylor v. Texas Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 641, 646-47 (Tex. App.—Austin 2005, pet. denied). Counsel has certified to this Court that he has provided Mother with a copy of the *Anders* brief

---

[1] For the child's privacy, we refer to him using a pseudonym and to his parents and other relatives by their familial relationships to each other. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

and informed her of her right to examine the appellate record and to file a pro se brief. No pro se brief has been filed.

Upon receiving an *Anders* brief, we must conduct a full examination of the record to determine whether the appeal is wholly frivolous. *See Penson v. Ohio*, 488 U.S. 75, 80 (1988); *Taylor*, 160 S.W.3d at 647. According to the affidavit in support of relief filed by the Texas Department of Family and Protective Services (the Department), a copy of which was admitted into evidence at the termination trial, the case began in October 2022, shortly after John was born, when the Department received a referral that Mother had "given birth outside of a Goodwill with little to no prenatal care and both her and [John] were positive for opiates on a urine analysis drug testing at birth." The referral further stated that Mother and John's father were homeless and that Mother had been diagnosed with bipolar disorder but was not receiving any medications. The Department received an additional referral stating that Mother had "consumed methamphetamines and heroin throughout the pregnancy which as a result led to [John] experiencing signs of withdraw[al]." During the investigation, Mother admitted to "shooting up" heroin during her pregnancy, "including twice before she knew that she was pregnant and three times after knowing that she was." John's meconium results returned positive for opioids and THC. The Department also received information that Father used illegal substances, including methamphetamine and marijuana.

Based on the above information, the Department filed a petition requesting that Mother and Father participate in court-ordered services, including drug testing. The Department later amended its pleadings to seek termination of Mother's and Father's parental rights to John.

The case proceeded to a bench trial. Department investigator Kate Torres testified about the circumstances leading to John's removal, including the Department's concerns

2

regarding Mother's admitted drug use during pregnancy, John's positive drug test, and Mother's untreated bipolar disorder. When Torres went to the hospital to speak with the family, she observed John experiencing physical symptoms of withdrawal, including "tremors that were pretty bad," difficulty feeding, and frequent vomiting. Torres spoke to Mother and Father about participating in the Department's drug-court program, which would allow them to have custody of John while working services. Mother agreed to participate but Father did not. The Department transported Mother and John to a drug-treatment facility in Houston. However, after one day, Mother left the facility, telling Torres that "she no longer wanted to participate in the program." Torres advised Mother that discontinuing drug court meant that John would be removed from her care, and Mother indicated that she understood, informing Torres that she wanted to return to Austin to be with Father. Torres also testified that Mother and Father did not complete three requested drug tests in October and November 2022.

While the case was ongoing, Father was arrested for the offense of unauthorized use of a motor vehicle, and Mother was with him at the time of the arrest. Officer Christopher King of the Austin Police Department (APD) testified that on May 19, 2023, he and other officers responded to a report of a stolen vehicle. Officers conducted a traffic stop on the vehicle, and the occupants of the vehicle were identified as Father and Mother. Officers found drug paraphernalia inside the vehicle, including narcotics pipes with burnt residue, foil with burn marks on it, small baggies, and, within a black backpack located in the backseat behind where Mother was sitting, a prescription pill bottle with Mother's name on it and a clear plastic bag containing "numerous tablets" that King "recognized from training and experience to be consistent with MDMA or Ecstasy tablets." The tablets later tested positive for methamphetamine with a total weight of 11.5 grams.

3

Department caseworker Melynie Harris testified that during the case, Mother had not engaged in her court-ordered services. Specifically, Mother had not attended therapy sessions, taken parenting classes, completed a psychological evaluation, or completed an Outpatient Screening Assessment Referral (OSAR) for substance abuse. Mother had completed only three out of thirteen requested drug tests, and she had participated in only nine visits with John between November 2022 and November 2023, even though the Department had authorized visits on a weekly basis. Because of the lack of regular visitation between Mother and John, Harris did not believe that John had formed a bond with Mother. Harris also did not believe that Mother had addressed her substance-abuse issues or demonstrated that she could provide a safe and protective home for John.

Throughout the case, John had been placed with his maternal great aunt (Aunt). Harris testified that the Department's plan for John was for him to continue to reside with and be adopted by Aunt. Harris had visited John in Aunt's home, and John appeared happy there, "very active," "very comfortable," and "very bonded with the caregiver." Harris believed that Aunt had provided for John's physical and emotional needs, and the Department had no concerns about Aunt's ability to meet John's future emotional, medical, and physical needs. The Department believed Aunt was a loving and safe placement and that John would continue to grow and thrive there. Additionally, John had an older brother who was also residing with Aunt.

Aunt testified that John has been in her care since November 2022. Aunt was aware of John's withdrawal symptoms after birth, and she made sure to take him to his follow-up medical appointments. Aunt lived with her husband, three biological children, and John's older brother, who was eight years old at the time of trial and had been placed with Aunt in 2017. Aunt explained that John and his older brother get along well, that John was bonded with her and

4

her family, and that she wanted to adopt him. She believed that it would be traumatizing for John to be removed from her care.

Aunt testified that Mother did not frequently ask about or visit John. She did not believe that John knew that Mother and Father were his biological parents or that there was a bond between Mother and John. Aunt was concerned about Mother's ability to support John and remain sober. She recounted that she had known Mother "almost her whole life," "since she was three or four years old," and that "this is a pattern. She does good for a little bit and then after that she goes back to doing her drugs and not being stable, so it's just a pattern."

CASA volunteer Jayne Snyder testified that she first visited John at Aunt's home in January 2023 and that CASA personnel had no concerns about the placement. Snyder testified that CASA personnel were concerned about Mother and Father not engaging in services and not regularly visiting John. CASA personnel were also concerned about the parents' ability to provide a safe environment for John and the fact that John had been exposed to illegal substances in utero. Snyder testified that John was "thriving" in his current placement, that he was "clearly bonded to the family," and that he was "growing and comfortable in the environment." CASA personnel were in agreement with the Department's recommendation that Mother's and Father's parental rights be terminated.

Mother testified that she was sober at the time of trial and had been sober for over "six, seven months now." However, she later changed her testimony to "seven, eight months now," and she later had difficulty remembering her specific date of sobriety. Mother testified that her "drug of choice" had been heroin and that the prescription bottle that was found in the stolen vehicle was for her Suboxone strips, which "helped [her] get off the heroin that [she] was using." Mother was receiving assistance from Lifeworks, which Mother described as "an

organization that helps young teens, young parents get housed and just they help us maintain our goals in trying to maintain stability and work." Mother was currently staying in a hotel that Lifeworks had provided for her and believed that she was on track to have an apartment within two months. Mother acknowledged that she had been arrested in May 2023 for possession of a controlled substance but testified that she did not understand why that would be used against her "when it's the past" and she was currently "clean."

Mother further testified that she had difficulty communicating with the Department for various reasons when the case began and had been unaware of many of the services that the court had ordered her to complete. Regarding her decision not to continue with the drug court program, Mother testified that "she didn't understand it" and "didn't know what exactly [she] was doing" at that time. When asked if it would have been in John's best interest for her to participate in drug court, Mother testified, "Everyone's different. Everyone has their own pace and time, so I'm ready now to try and—you know what I'm saying—show y'all that I can be there for my kid and I'm trying to be there for my kid." She testified that she had not attended any NA or AA meetings but that she "will start" attending meetings if the court granted her an extension and gave her more time to prove that she was "ready to be a mother to [her] son." Mother acknowledged that she had not completed her court-ordered services but indicated a willingness to do so if the court continued the case, including completing a psychological evaluation that she testified was scheduled for the day after trial.

At the conclusion of trial, the district court found by clear and convincing evidence that Mother had (1) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; (2) constructively abandoned the child; and (3) failed to comply with the provisions of a court

6

order that specifically established the actions necessary for Mother to obtain the return of the child. *See* Tex. Fam. Code § 161.001(b)(1)(E), (N), (O). The district court further found by clear and convincing evidence that termination of Mother's parental rights was in the child's best interest. *See id*. § 161.001(b)(2). The district court made the same findings regarding Father. In accordance with these findings, the district court terminated Mother's and Father's parental rights to John. This appeal by Mother followed.

After reviewing the entire record and the *Anders* brief submitted on Mother's behalf, we have found nothing in the record that might arguably support an appeal. Our review included the district court's endangerment finding, *see* Tex. Fam. Code § 161.001(b)(1)(E), and we have found no issue that could be raised on appeal with respect to that finding, *see In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019). We agree with counsel that the appeal is frivolous.

## CONCLUSION

We affirm the district court's order of termination.

_____

Gisela D. Triana, Justice

Before Justices Baker, Triana, and Kelly

Affirmed

Filed: February 28, 2024

7